**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Case No. 22-CR-80 (CRC)** |
| **v.** | : | |
| | : | |
| **JOSHUA JOHNSON,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Sentencing Memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joshua Johnson to 24 months of imprisonment, the midpoint of the applicable guideline range, three years of supervised release, $2,000 in restitution, and a $100 special assessment.

## I.      INTRODUCTION

The defendant, Joshua Johnson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1] Johnson stormed into the Capitol building through the East Rotunda doors, donned a gas mask, and entered the Senate Chamber and photographed or filmed documents left behind on a Senator's desk.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government incorporates by reference the details of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election, contained in the Presentence Investigation Report ("PSR") and the Statement of Offense (ECF No. 39) incorporated into Johnson's plea agreement. *See* Statement of Offense at ¶¶ 1-7; PSR at ¶¶ 15-21.

### A.  The January 6, 2021, Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense filed in this case, ECF 43, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

***Breach of the Capitol Building on the East Front and the Rotunda Door***

One of the main points of entry for rioters on January 6, 2021 was through a set of ornate double doors at the top of the Central East Steps. These doors have been referred to as the Columbus Door or the Rotunda Door. The Rotunda Door is often regarded as the main door into the Capitol Building. In Images 1 and 2 below, the Rotunda Doors are circled in red.



*Image 1 – Screenshot from https://youtu.be/CqBB3Mt06XA*

On January 6, 2021, the outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling through the grounds. In Image 2, the barricades on the East Front are indicated with dotted lines.

3



*Image 2: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

On the afternoon of January 6, a crowd gathered on the East Front, outside the perimeter. At about 1:58 p.m., individuals in the northeast corner began to tear down the barricades and move into the East Plaza.



4

*Image 3: Screenshot from https://youtu.be/z1gODZvbhqs*

Shortly thereafter, rioters began pushing against police and tearing down barriers throughout the perimeter.



*Image 4: Screenshot from Capitol Security Video*

The rioters pressed forward, through the East Plaza.



*Image 5: Screenshot from https://youtu.be/185f3LPxUYU*

The USCP established a temporary police line at the base of the East Central steps, but were soon overrun.   At about 2:06 p.m., rioters flooded up the steps, between the columns, and on to the surrounding balconies.



*Image 6: Screenshot from Capitol Security Video*

The USCP officers retreated to the Rotunda Doors, and were surrounded. Rioters attacked them with sticks, fists, flag poles, and tear gas before they escaped the area.





*Images 8 and 9: Screenshots from https://youtu.be/MVullQb-Lec*

Rioters outside the Rotunda Door attacked the police and tried to break in, smashing the windows in the process. At about 2:25 p.m., a rioter already inside the Capitol opened the door from the inside. Rioters rushed through the door, as others tried to jam a flag through the door to keep it open.   Other members of the exterior crowd assaulted officers who stood with their backs to the Rotunda Door, defending it.





*Images 10 and 11: Screenshots from Capitol Security Video*

Rioters fought officers to keep the door open, pushing and pulling them out of the way, trying to jam their bodies in the doorframe. Officers succeeded in closing the door at approximately 2:28 p.m., after one officer hurled himself through the door and turned his back to the crowd, pushing them back just enough to allow space for the door to close.



*Image 12: Screenshot from Capitol Security Video*

While officers stood guard at the doors, and then barricaded the door with benches, tensions remained high. Rioters outside continued yelling and chanting and skirmishing with officers,

trying to breach the doors again. At about 2:37 p.m., rioters from the Rotunda moved towards the doors in an effort to open them, while USCP officers rushed to guard the doors from the inside.



*Image 13: Screenshot from Capitol Security Video*

At about 2:39 p.m., the rioters pushed forward, crushing the police, and forcing the doors open again.



*Image 14: Screenshot from Capitol Security Video*

Once the doors had been breached, and as a security alarm blared, hundreds of rioters poured into the building and past overwhelmed USCP officers, who were pinned against the door.



*Image 15: Screenshot from Capitol Security Video*

Rioters continued to push through the Rotunda Door for another hour, battling with police over control of the doors. A combined force of USCP and MPD officers were finally able to secure the Rotunda Doors at around 3:30 p.m.



*Image 16: Screenshot from Capitol Security Video*

**B.  Defendant's Role in the January 6, 2021 Attack on the Capitol**

On January 4, 2021, Johnson flew from Spokane, Washington to Washington, D.C. to protest Congress' certification of the Electoral College.   According to text messages recovered

from Johnson's cell phone, Johnson had attended other D.C. rallies on January 5, 2021 leading up to the certification.

On January 6, 2021, Johnson attended the rally in support of President Trump and, during the President's speech, decided to march to the Capitol to "bust in there and be heard" and make his presence known to Congress, intending not merely to protest, but to stop the certification of the Electoral College vote.   (Johnson Custodial Interview) As he later told FBI, he believed Congress would actually be in session when he entered the Senate Chamber.   Johnson "thought they [Congress] were going to be in the room" and that he and others could make demands that Congress and Vice-President Mike Pence "do the right thing." (Johnson Custodial Interview)

Johnson took video that portrays the East Front of the Capitol—including the police line of officers trying to maintain the metal barriers on the East front against the mob—and depicts him yelling at officers.   Johnson is on the front lines against police on the East front.



*Image 16: 2:37 of Video Taken by Johnson on January 6, 2021*



*Image 17: 2:46 of Video Taken by Johnson on January 6, 2021*

As Johnson approached the Capitol Building, he saw police and rioters spraying each other with what he believed to be mace.   (Johnson Custodial Interview)

After seeing officers who Johnson later described to the FBI as looking "scared" trying to protect the East Rotunda doors, he entered the Capitol at approximately 2:40 p.m. through the same East Rotunda doors. (Johnson Custodial Interview) Johnson would have heard the loud door alarm the entire time.



*Image 18: Screenshot from Capitol Security Video at approximately 2:40 p.m.*

Once inside, Johnson immediately climbed a set of stairs leading up from this area and made his way to the foyer outside the Senate Gallery.



*Image 19: Screenshot of Capitol Security Video at approximately 2:41 p.m.*

In making his way to the Senate chamber, he checked door handles as he went down the hallways and went into other rooms.  He described seeing "desks turned over" and "paper

13

everywhere" in one of the rooms as he made his way to the Senate floor, and that others "got into Nancy Pelosi's liquor cabinet."   (Johnson Custodial Interview)



*Image 20: Screenshot of Capitol Security Video at approximately 2:42 p.m.*

While outside the Senate Gallery, at about 2:43 p.m., he put on a gas mask.



14

*Image 21: Screenshot of Capitol Security Video at approximately 2:43 p.m.*

He made his way to the Senate gallery, where he discovered that the Senate was not currently in session—though he expected them to be there.   (Johnson Custodial Interview) Johnson then removed the mask, and worked with other rioters to find the keys to enter the Senate floor.   (Johnson Custodial Interview)



*Image 22: Screenshot of Capitol Security Video at approximately 2:46 p.m.*

Johnson then entered the floor of the United States Senate.



*Image 23: Screenshot of Capitol Security Video at approximately 2:46 p.m.*

Johnson later told the FBI his goal was to "be heard" and to influence Vice President Pence "to do the right thing." (Johnson Custodial Interview) He wanted to "stop the steal," meaning, stop the certification of the Electoral College vote. Once in the Senate chamber, Johnson rifled through documents on a Senator's desk, which he later identified in a text message as Senator Feinstein's desk, and filmed video of them using his cell phone.





*Image 24: Screenshot of Capitol Security Video on the Senate Floor*

Johnson also personally took photographs and videos during his 17 minutes on the

Senate floor:



*Image 24: :09 of Video Taken by Johnson on January 6, 2021*

During this video that he sent to others, he said "so she knows the rules of the Senate," referring to Senator Dianne Feinstein.   Johnson recognized her desk and later told others about having looked through it.



| Source | From | To | All timestamps | Content | Deleted |
|---|---|---|---|---|---|
| IMS Service | +15093094001<br>josh johnson™<br>(owner) | +18177738068<br>Jessica™ | **Timestamp:**<br>1/8/2021<br>1:40:36<br>AM(UTC+0) | **Direction:**<br>Outgoing<br>**Body:**<br>That was Feinsteins desk.<br><br>**Participants:**<br><br>Participant   Delivered  Read  Played<br><br>+18177738068<br>Jessica<br><br>**Message Type:**<br>SMS<br>**Folder:**<br>Sent | |

*Image 25: screenshot of Johnson's text messages*

Johnson also went up to the dais itself—and walked across the dais to the other side of the chamber, pausing near the Vice President's chair.



TCG 14;52;32;32

19

*Image 26: Image from Capitol Security Video at approximately 2:52 p.m.*

Johnson walked over to the Republican side of the Senate and grabbed a water bottle off of Senator Rick Scott's desk, and drank it.



*Image 27: Image from Capitol Security Video at approximately 2:53 p.m.*



*Image 28: Image from Capitol Security Video at approximately 2:53 p.m.*

Johnson then proceeded to place his things on another desk and take off his outer overall clothing, even kicking off his shoes to do so.



*Image 28: Image from Capitol Security Video at approximately 2:55 p.m.*



*Image 29: Image from Capitol Security Video at approximately 2:56 p.m.*





*Images 30, 31: Images from Capitol Security Video at approximately 2:57 p.m.*

Johnson then looked at more Senate papers with another rioter.



*Image 32: Images from Capitol Security Video at approximately 2:59 p.m.*

Then Johnson made his way toward another group who had been in the Senate chamber, sitting at the Senator's desks for about the same time he had.

24



*Image 33: Image from Capitol Security Video at approximately 3:01 p.m.*

At approximately 3:02 p.m., Johnson left the Senate Chamber only when he feared that there were enough officers gathering to arrest individuals on the Senate floor.   Johnson later told the FBI that he only left because he and other rioters noticed that there were more officers gathering, and another rioter said "if we don't leave they're going to arrest us right now." At which point, Johnson decided to leave and exited the Capitol through the North Doors at about 3:07 p.m. Just after leaving the building, Johnson triumphantly raising his hands in the air.

25



*Image 34: Image from Getty Images of Johnson Exiting Capitol*

Afterwards, Johnson texted others saying, "it was awesome."

| Source | From | To | All timestamps | Content | Deleted |
|---|---|---|---|---|---|
| IMS Service | +15093094001 josh johnson™ (owner) | +15099990238 Darius Johnson™ | **Timestamp:** 1/7/2021 1:08:19 AM(UTC+0) | **Direction:** Outgoing <br> **Body:** <br> What are you talking about? It was awesome. His twitter is banned. <br> **Participants:** <br> Participant　　Delivered　Read　Played <br> +15099990238 <br> Darius Johnson <br> **Message Type:** <br> SMS <br> **Folder:** <br> Sent | |

*Image 35: Image from Johnson's Text Messages*

## III.    THE CHARGES AND THE PLEA AGREEMENT

On March 11, 2022 a federal grand jury returned an indictment charging Johnson with five

counts, including Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2).

On March 21, 2023, Johnson was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Johnson now faces sentencing on Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2). As noted by the plea agreement and the PSR issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government concurs with the U.S. Probation Office's assessment of the appropriate offense level and guideline, which matches the calculation in the plea agreement. ECF No. 38.

### Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[2] | +3 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |

**Total  +14**

The government concurs with the U.S. Probation Office's determination that Johnson's criminal history score is III. PSR ¶ 9. While Johnson objects to the assessment of one criminal

---

[2] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Johnson admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

history point for offense listed in ¶ 51 and another point for the offense listed in ¶ 52, both points are appropriate. On April 17, 2019, Johnson plead guilty to two separate counts of Aggravated Robbery, involving two separate victims, and received a single sentence for both crimes of violence.  PSR ¶ 51-52.  Under U.S.S.G. §4A1.1(e), where a defendant received sentences for crimes of violence that were "treated as a single sentence . . . one point is added under §4A1.1(e) for each such sentence that did not result in any additional points under §4A1.1(a), (b), or (c)." U.S.S.G. §4A1.1, App. No. 5. This calculation was agreed upon in the plea agreement. (ECF No. 38 (Johnson Plea Agreement), at 4.)

The government notes, moreover, that even if Johnson's objection were sustained, he would still have five criminal history points, and still be in criminal history category III.

Based upon a total offense level of 14 and a criminal history category of III, the defendant's guideline imprisonment range is 21 months to 27 months. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.   (ECF No. 38 (Johnson Plea Agreement), at 4.)

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Johnson's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Johnson marched onto restricted Capitol grounds with the intent

to influence Vice President Mike Pence's actions as President of the Senate. Johnson prepared for violence by bringing with him and donning a gas mask. Johnson entered and remained inside the Capitol building and made it all the way to the floor of the United States Senate where he photographed and filmed records and documents on a Senator's desk in the chamber. The nature and circumstances of Johnson's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 24 months of incarceration.

### B. The History and Characteristics of the Defendant

Johnson is a 32-year-old father who resides in Sherman, Texas. PSR ¶ 61, 63-64. He has three children—two from a prior marriage and one from a prior relationship.   None of his children reside with him currently. PSR ¶ 63-64. He owes nearly $37,000 in child support. PSR ¶ 75. Johnson has a history of marijuana use, including while on pre-trial supervision. PSR ¶ 69.

Johnson's crimes on January 6, 2021 were not an isolated event in an otherwise law abiding life. He has a significant history of arrests and conviction, often for violent offenses and domestic violence, and a history of contempt for the court system.

*Armed Robbery*

In 2022, Johnson was convicted of two counts of Aggravated Robbery he committed in 2019. He robbed two victims, using a gun, and was sentenced to five years of community supervision. PSR ¶ 51. Specifically, in April 2019, Johnson robbed a vape shop in Collin County, Texas.   He entered the store wearing a ski mask and hoodie and held employees at gunpoint. He stole the employees' wallets and phones and stole money from the register. He was charged with felony aggravated robbery and was arrested on November 18, 2021. Johnson was convicted of two counts on March 7, 2022, and sentenced to two five-year terms of probation.

*Domestic Violence*

Johnson's extensive domestic violence charges are also concerning. In 2021, Johnson was convicted of First Degree Trespass – Domestic Violence. On July 20, 2021, six months after his participation in the Capitol riot, Johnson forced his way into his parents' home, attempting to punch his father in the face, and demanding the firearm that his parents owned. PSR ¶ 53. According to the police report, Johnson became enraged after his mother refused to buy a gun for him earlier that day. He then showed up at his mother and father's trailer and forced his way in, yelling, "where is it?," presumably referring to a firearm owned by his mother. Johnson tried to punch his father in the face and his father was able to successfully push Johnson out the front door and lock the door behind him. In September 2021, he was convicted of criminal trespass for this conduct and was sentenced to 364 days' jail.

That was not Johnson's first domestic violence conviction; in 2012 and 2017, he was twice convicted of assault causing bodily injury to his wife.   In 2010, Johnson was also arrested for assault causing bodily injury to a family member (disposition unknown).

The facts of the 2012 conviction, according to the police report, are revealing. In a hotel room where they were staying together, Johnson stood in the bathroom and refused to let his girlfriend use the bathroom in privacy. He became enraged and attacked her with a hot hair straightening iron, and then choked her with his hand until she could not breathe. She managed to get into the bathroom and hid there with their 7-month-old daughter. Johnson's girlfriend asked if she could leave, but he said no, and threw her onto the bed and started choking her again with both hands before violently head-butting her. She only told her aunt, who quickly called the police, because the bruising on her neck and arms were so pronounced that she was being asked about it.

*Dishonesty to Authority*

Johnson has a history of lying to law enforcement and not reporting to Courts. In 2018, Johnson was convicted of Failure to Identify as a Fugitive and Giving False Information. When Johnson was stopped by a police officer, he gave a false name and false date of birth because he knew there was a warrant out for his arrest. For this conduct, Johnson was sentenced to 15 days in jail. PSR ¶ 50.   Specifically, when the police stopped the car that Johnson was driving (which had no front license plate), Johnson gave a false name ("Joshua P. Johnson") and birth date. He said he could not remember if he had a Texas driver's license. Johnson later admitted he had lied to the officer because he thought there was a warrant out for his arrest. He also said that the name Joshua E. Frederick was on his driver's license, but he uses the name Johnson. A database check showed that an individual with the name Joshua E. Frederick did have a warrant for his arrest.

Even in his failure to conform to the pretrial conditions in this case, Johnson has been dishonest with authority. When he failed multiple marijuana tests, Johnson was dishonest to probation—claiming the positive tests were due to residual use prior to his Indictment; however, as pretrial services has noted, Johnson tested negative consistently beginning in May 2022 and then positive in September 2022 and again on November 28, 2022, which means it could not have been residual. Further, Johnson's supervision conditions were modified to include treatment—but Johnson has yet to start a treatment program. Instead of complying with the modified order, Johnson reported he believes it is "silly" that the drug is illegal. PSR ¶ 51.

Johnson continued to commit crimes even after January 6, 2021, demonstrating that his actions that day were merely one example of his pattern of violent criminal behavior.   These convictions show Johnson's willingness to cause harm, terrify others, and ignore authority when

they stand in his way. January 6 was a different type of crime but, in some ways, in the same vein: Johnson, among the rioters, displeased with the election results, refused to let basic rules of right and wrong – *i.e.*, don't break into the Senate Chamber – stand in their way.

The defendant's history and characteristics, including his history of arrest and conviction for violent assaults, domestic violence, and contempt for the criminal justice system, weigh heavily in favor of a lengthy term of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Johnson's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Not only is his criminal history telling of a pattern of violence and lack of respect for authority, as well as dishonesty, but in his statements

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

32

about his actions on January 6, 2021 Johnson has minimized his role and culpability.

As stated above, the breach of the U.S. Capitol with the intent to disrupt the Electoral College vote count is the epitome of disrespect for the law. Johnson's criminal history show a pattern of disrespect for the law. His criminal history includes a failure to appear and the provision of false information to law enforcement to avoid identification as a fugitive. Additionally, Johnson's failure to abide by the terms of pre-trial supervision by testing positive for marijuana and failing to start any sort of substance abuse treatment further show disrespect for the law. Johnson's criminal history also shows that he poses a danger that requires specific deterrence.

Johnson, when interviewed by the FBI in November 2021, showed no remorse for his actions on January 6, 2021.   Instead, he continually repeated that he "was just taking pictures" and that he "didn't post anything" and "didn't break anything, didn't vandalize."   When asked how he got into the Capitol, Johnson claimed he was "just kind of following people" and that he was pushed or swept into the Capitol, raising his hands and just propelled into the Captiol by the crowd. (Johnson Custodial Interview) This is not what the evidence shows.

Johnson also claimed he spoke with officers who said said "it was nothing like when Antifa came through," continually minimalizing the violence and destruction of the riot that day.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

The primary distinction for many of these cases will be Johnson's substantial criminal history. This is not an aberration in an otherwise law-abiding life. Rather, Johnson's criminal history is substantial and should merit even longer sentences than those below with similar conduct on January 6, 2021.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Christopher Moynihan*, 21-cr-226-CRC, Moynihan was among the first rioters to enter the Capitol Grounds by breaching police barricades on the East Front. Moynihan climbed the steps and joined the rioters outside the Rotunda Door. Moynihan watched as rioters attacked police trying to defend the door, and continued pushing his way forward. Moynihan marched directly to the Senate Chamber, chanting and shouting as he walked through the halls of the Capitol and then entered the Senate Chamber itself. While on the Senate floor, he rifled through Senator's papers.  He did not commit acts of violence.  He committed a violation of Section 1512(c)(2) along with two misdemeanors. This Court sentenced him to 21 months incarceration and 36 months supervised release, and $2,000 restitution.

In *United States v. Christine Priola,* 22-cr-242-TSC, Priola made her way to the Senate floor. While on the Senate floor, Priola spoke to an associate by telephone and encouraged that

---

CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

person to come inside either the Capitol building or the Senate Chamber, saying it was "now or never." Sometime before January 13, 2021, Priola deleted from her cellular telephone photos, videos, chats, and messages regarding her activities on and around January 6. Priola's guidelines range was 15-21 months, in part due to a lack of criminal history which is a distinguishing factor here, and Judge Chutkin sentenced her to 15 months incarceration for her violation of Section 1512(c)(2).   Unlike Priola, who had no criminal history leading up to January 6, Johnson has extensive and violent criminal history—which has continued even after January 6, 2021—so the fact that Priola and Johnson were in the Senate Chamber around the same time, with similar conduct, points to a longer sentence for Johnson in this case.

In *United States v. John Strand*, 1:21-CR-85-CRC, Strand also entered the Capitol and was outside the House Chamber on January 6, 2021.   He claimed to have been forced into the Capitol by the physical push of the mob as well.   For his violation of Section 1512(c) and four misdemeanors, this Court sentenced him to 31 months incarceration and 36 months supervised release, along with $2,000 restitution.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss

---

6 The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Johnson must pay $2,000 in restitution, which reflects in part

the role Johnson played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement

reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other

governmental agencies as of October 2022. *Id.* Johnson's restitution payment must be made to the

Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim

entities. *See* PSR ¶ 12.

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of 24 months of imprisonment followed by three years of supervised release, $2,000

---

18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

7 Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY: _/s/ Victoria A. Sheets_____


VICTORIA A. SHEETS
Assistant United States Attorney
NY Bar No. 5548623
601 D Street, N.W.,
Washington, D.C. 20001
(202) 252-7566
Victoria.Sheets@usdoj.gov

KYLE R. MIRABELLI
Assistant United States Attorney
Capitol Siege Section
N.Y. Bar No. 5663166
601 D Street, N.W.,
Washington, D.C. 20001
202-252-7884
Kyle.Mirabelli@usdoj.gov